UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THE HANOVER INSURANCE GROUP,<br><br>Plaintiff<br><br>vs.<br><br>ANTHONY F. ROSCITI, JR.; HENRY V. ROSCITI; and A.H.R. UTILITY CORPORATION,<br><br>Defendants | : | C.A. No.: 06-276/T |
| ANTHONY F. ROSCITI, JR.; AND SHANNON B. ROSCITI,<br><br>Plaintiffs<br><br>vs.<br><br>THE HANOVER INSURANCE GROUP; SOUTH SHORE UTILITY CONTRACTORS, INC., by and through Jonathan N. Savage, Esq., duly appointed Permanent Receiver of South Shore Utility Contractors, Inc.; HENRY V. ROSCITI; and AHR UTILITY CORPORATION, | : | C.A. No. 06-392/T |

AFFIDAVIT OF ANTHONY F. ROSCITI, JR.

I, Anthony F. Rosciti, Jr., upon oath, depose and say as follows:

1. In or about 2006, I was the President and fifty percent (50%) shareholder of South Shore Utility Contractors, Inc. ("South Shore"). As such, I have personal knowledge of the facts stated herein.

2. In or about 2005, The Hanover Insurance Group ("Hanover") furnished certain performance and payment bonds on behalf of its principal, South Shore, naming Earth Tech and

O. Ahlborg and Sons, Inc. (collectively, "Earth Tech"), respectively, as obligees for that certain project known as the Pawtucket Water Treatment Facility (the "Pawtucket Project") in the total amount of Five Million Six Hundred Sixteen Thousand Thirty Dollars and 00/100 ($5,616,030.00) (the "Pawtucket Project Bonds").

3. In addition, at or about that same time, Hanover furnished certain payment and performance bonds or on behalf of its principal, South Shore, naming the Amtrak-National Railroad Passenger Corporation ("Amtrak"), as obligee for a project known as the Freight Rail Improvement Project, twenty-four (24) inch water main relocation in Providence, Rhode Island (the "Amtrak Project") in the amount of Three Hundred Sixty-Five Thousand Nine Hundred Dollars and 00/100 ($365,900.00) (the "Amtrak Project Bonds").

4. In or about May, 2005, South Shore, myself, Shannon B. Rosciti ("S. Rosciti"), Henry Rosciti ("H. Rosciti") and A.H.R. Utility Corporation ("AHR"), and each of them, executed an Agreement of Indemnity (the "Indemnity Agreement") in favor of Hanover relative to the Pawtucket Project Bonds and the Amtrak Project Bonds, respectively.

5. Subsequent to the commencement of the Pawtucket Project and Amtrak Project, respectively, and during South Shore's discharge of its scope of work in connection with these projects, South Shore had disputes with two (2) of its subcontractors regarding payment.

6. One of the disputes involving the Pawtucket Project related to measurement and payment terms in a subcontract. That dispute involved G. Donaldson Construction Co., Inc. ("G. Donaldson"), with whom South Shore ultimately reached an agreement as to settlement, payment terms and a payment schedule relative to the subject dispute in or about March, 2006. South

Shore's subcontract with G. Donaldson was a quantity and sum certain subcontract, and not simply a lump sum contract.

7. In fact, South Shore, by and through its counsel, advised Hanover, by and through its counsel, as to the pendency of South Shore's agreement to settle and pay an agreed-upon amount with respect to the G. Donaldson claim.

8. At or about this same time, South Shore and Hanover were engaged in a dialogue and Hanover had requested certain information relative to the G. Donaldson claim, as well as the South Shore's status with respect to the so-called Pawtucket Project and Amtrak Project, respectively, and its financial condition.

9. In fact, on March 21, 2006, the very same day that Hanover wrote directly to the project owners for the Pawtucket Project and Amtrak Project, respectively, and instructed each of them to not release further contract funds to South Shore absent Hanover's express consent, Hanover, by and through its counsel, made a written request upon South Shore to review certain of South Shore's financial information and/or documents, and, further, to meet to review the same with myself and South Shore's other shareholder, H. Rosciti.

10. Notwithstanding, however, without prior notice to or the consent of South Shore, and despite South Shore's good faith efforts, on March 21, 2006, Hanover contacted the project owners directly, and instructed each of them that no further contract funds be released to South Shore.

11. On or about March 21, 2006, South Shore was still on the job discharging its scope of work relative to the Pawtucket Project and Amtrak Project, respectively, and, further, was not in

default of its contracts with the project owners in connection with the same. Even more, the same occurred despite the G. Donaldson settlement.

12. Additionally, Hanover's March 21st communication occurred less than two (2) full business days following its March 17, 2006 demand to the indemnitors under the Indemnity Agreement that they post additional collateral.

13. As of March 21, 2006, I was not in default of the Indemnity Agreement insofar as I had not yet had a reasonable opportunity to consider and act on Hanover's March 17th demand to post additional collateral.

14. The other subcontractor dispute also involved the Pawtucket Project, wherein a subcontractor, Vellano Bros., was applying payments on the Pawtucket Project and other "bonded" work to only outstanding requisitions on "non-bonded" projects, and, thus creating an inflated receivable. South Shore's records supported its position with regard to Vellano Bros.

15. Hanover had knowledge that South Shore had settled the dispute with G. Donaldson, and that South Shore's records supported South Shore's position relating to the Vellano Bros. dispute.

16. Despite the settlement of the G. Donaldson dispute, and the good faith position advanced by South Shore relative to the Vellano Bros. dispute, Hanover took it upon itself on March 21, 2006, to communicate directly with the owners on both the Pawtucket Project and the Amtrak Project, respectively, and, further, notified and directed those owners not to make any further payments to the South Shore, which said action was without the prior knowledge or authorization of South Shore, and despite the fact that South Shore was not in default of those project contracts.

17. As a result of Hanover's motions, South Shore's "flow of funds" from the subject projects was "cut-off" and South Shore could not consummate the G. Donaldson settlement.

18. Hanover took this March 21st action even though South Shore had not defaulted on its contracts, that neither South Shore nor any of the individual indemnitors had acknowledged any voluntary default under the Indemnity Agreement, and South Shore had not yet consented to a letter of direction with respect to the payment of remaining contract funds relative to the subject projects.

19. Hanover's March 21, 2006 communication, and the resulting effect of the same created a default of South Shore relative to the Pawtucket Project and Amtrak Project, respectively, where one previously, and otherwise, did not exist as of March 21st.

20. By April, 2006, with all income from the Pawtucket Project and Amtrak Project, respectively, "cut-off", South Shore no longer had the ability to conduct an otherwise successful business, including completing the subject projects and so advised Hanover.

21. However, I was able to secure a take-over arrangement with Rosciti Construction that ensured the completion of the Pawtucket Project and Amtrak Project, respectively, despite Hanover's action.

22. I only executed, and acknowledged, a voluntary default on behalf of myself and South Shore on or about April 13, 2006, as well as signed a direction of payment letter on behalf of South Shore because I was advised by Hanover that unless I did so Hanover would not consent to the take-over arrangement that I had secured on South Shore's behalf with Rosciti Construction relative to the Pawtucket Project and Amtrak Project, respectively.

23. Insofar as South Shore had no ability to continue in its business I ultimately petitioned South Shore into a Rhode Island Superior Court receivership proceeding in May, 2006. South Shore's default and inability to perform under its contracts resulted from Hanover's direction to the owners of the Pawtucket Project and Amtrak Project, respectively, not to remit any further contract funds to South Shore, thereby resulting in South Shore's "flow of funds" relative to these projects being "cut-off" and South Shore being left with no ability to continue business operations.

______________________________
Anthony F. Rosciti, Jr.

STATE OF RHODE ISLAND
COUNTY OF PROVIDENCE

SWORN AND SUBSCRIBED to on
this 23rd day of July, 2008.

______________________________ Moshe Berman 61728
Notary Public
My commission expires: 2/14/2012

## CERTIFICATION

I hereby certify that on this 23rd day of July, 2008, the foregoing was served upon **Ronald E. Ritland, Esq.**, via e-mail @ rritland@peabodyarnold.com; **Kevin C. Cain, Esq.**, via e-mail @ kcain@peabodyarnold.com; **Joseph DeAngelis, Esq.**, via e-mail @ jdeangelis@apslaw.com; and **John P. Connelly, Esq.**, via e-mail @ jconnelly@peabodyarnold.com.

/s/ Christopher M. Mulhearn